1

2

3

4                    IN THE UNITED STATES DISTRICT COURT

5              FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

6

7

8

     _____
9                                              )
     UNITED STATES OF AMERICA,                 )
10                                             )
                                               )
11                                             )
                      Plaintiff,               )
12                                             )
         vs.                                   )     Case 1:11cr060
13                                             )
                                               )
14   HARVEY DOUGLAS GOFF,                       )
                                               )
15                    Defendant.               )
                                               )
16   _____)

17

18              BEFORE THE MAGISTRATE SAMUEL ALBA

19                        MAY 16, 2012

20         REPORTER'S TRANSCRIPT OF ELECTRONIC RECORDING

21                      MOTION HEARING

22

23

24

25          Reported by:  KELLY BROWN, HICKEN CSR, RPR, RMR

1

2                          A P P E A R A N C E S

3    FOR THE PLAINTIFFS:   OFFICE OF THE US ATTORNEY

4                          BY: JOHN HUBER

5                             Attorney at Law

6                          185 SOUTH STATE STREET, 400

7                          Salt Lake City, Utah  84111

8

9    FOR THE DEFENDANT:   ED WALL

10                         Attorney at Law

11                         650 BOSTON BUILDING

12                         SALT LAKE CITY, UTAH  84111

13

14                            I N D E X

15   WITNESS                  EXAMINATION BY           PAGE

16   LISA STEVENS GOFF        DIRECT BY WALL           4
                              CROSS BY HUBER           9
17                            REDIRECT BY WALL         11

18   CHRIS VERLE SOELBERG     DIRECT BY WALL           13

19   HARVEY DOUGLAS GOFF      DIRECT BY WALL           16
                              CROSS BY HUBER           20
20                            REDIRECT BY WALL         26

21   CASEY HILL               DIRECT BY HUBER          31
                              CROSS BY WALL            35

22

23                 EXHIBITS RECEIVED INTO EVIDENCE
     EXHIBIT           PAGE
24
     DEFENDANT'S 1    19

25

```
 1                  Salt Lake City, Utah, May 16, 2012

 2                          *   *   *   *   *

 3             THE COURT:  All right.  Upon motion of the

 4    defendant for a detention hearing, we are here on the matter

 5    of the United States vs. Harvey Douglas Goff.

 6             Are we ready to proceed?

 7             MR. WALL:  Yes, Your Honor.  We'll call Lisa Goff.

 8             THE COURT:  Okay.

 9             MR. WALL:  We're not going to ask for exclusion of

10    witnesses today.

11             THE COURT:  That's fine.

12             Come on up right here.

13             THE WITNESS:  Right here?

14             THE COURT:  Just further closer.  Raise your right

15    hand.

16                      LISA STEVENS GOFF,

17         called as a witness at the request of Defendant,

18            having been first duly sworn, was examined

19                    and testified as follows:

20             THE WITNESS:  Yes.

21             THE COURT:  Take the witness stand.  The chair does

22    not move except sideways.  It doesn't move forwards or

23    backwards.  And you need to pull that microphone towards you.

24    And speak into the microphone so that everyone can hear you.

25             Give us your name for the record, please.
```

1          THE WITNESS:  Lisa Stevens Goff.

2          THE COURT:  Thank you.  Proceed.

3                     DIRECT EXAMINATION

4     BY MR. WALL:

5          Q.   Would you spell your last name for the record?

6          A.   G-O-F-F.

7          Q.   And are you related to Harvey Douglas Goff?

8          A.   Yes.  I'm married to him.

9          Q.   How are you related to him?

10         A.   Married to him.

11         Q.   How long have you known him?

12         A.   Over 30 years.

13         Q.   Now, what, since, January he's been in custody?

14         A.   Yes.

15         Q.   Okay.  Could you explain to the Judge what, if

16    anything, you have seen with regard to changes in him since he

17    went into custody?

18         A.   I've seen him -- I've seen expressions from him

19    that I've not seen before in all of these issues that we've

20    been through.  I've seen him tell me that he's not been

21    following the path that he should.  He should be providing and

22    caring for his family, and that the issues and crusades that

23    he's been pursuing have detracting him from those things that

24    are most important or should be most important to him.

25         Q.   Now, you say that he's made statements that he's

1    not been providing for his family as he should at them?

2         A.    Yes.

3         Q.    What has he not been doing?

4         A.    Providing, working and bringing in income,

5    following his pursuits to the exclusion of providing for me

6    and for our son when he was living at home.  I've been forced

7    to the role of sole provider for our family because of his

8    efforts and his pursuits.

9         Q.    Previously has he talked about making a genuine

10   effort of taking care of those kinds of responsibilities?

11        A.    In words only.  It's been pursuing something.  He

12   spends a lot of energy, and it's always been supposely to --

13   for the betterment of the family.  But there's never been any

14   real efforts to actually be productive and actually provide

15   for me.

16        Q.    What makes you think that what he's saying now is

17   any different than what he said before?

18        A.    Because of his admissions that he's failed on this

19   count, and that he realizes that it's his responsibility and

20   that he's failed in that responsibility, and that's what he

21   wants to spend his time doing now.

22        Q.    Has he ever before acknowledged that he has failed

23   in his responsibilities to his family?

24        A.    Not really.  Not really.  It's always been looking

25   forward.  And it's going to come.  My ship's going to come in.

1    It's going to, you know -- but this has seemed different to

2    me.

3        Q.   Would it be fair to say that this time he is

4    humbled?

5        A.   It's the first time that I feel he's been humbled

6    and willing to set aside his pride.

7        Q.   Would he be able to come home and live with you if

8    he were released?

9        A.   Yes.  I can put a roof over his head.

10       Q.   Do you have a land line telephone to call?

11       A.   Just a Vonage line.  I guess that's through the

12   Internet.  I don't have another.

13       Q.   Could you put a land line into your home so that he

14   could be monitored if you need a land line?

15       A.   Yes.  I believe it was done before under those

16   circumstances.

17       Q.   And if he were to come home, what are your

18   expectations that he would be doing?

19       A.   That he get a job in order to provide immediately

20   for the family, that he abandon these other pursuits and take

21   care of these most important responsibilities.  And that's

22   providing, putting food on the table, bringing money in,

23   building relationships that he's damaged through his exercise

24   of these other pursuits that he's been following.

25       Q.   Now, I take it, when you talk about building

1     relationships that he's damaged, you're talking about

2     significantly his only son?

3          A.   Yes.  Yes.

4          Q.   Will you tell the Judge what's happened with regard

5     to his son?

6          A.   Our son is -- refuses contact with him.  He's --

7               THE COURT:  How old is your son?

8               THE WITNESS:  He is 24, almost 25.  Married, has a

9     new baby.  Does not want right now to see him, does not want

10    to have interaction with him or his grandchild.  I don't know

11    that there's animosity, but there's just the need to be

12    separate right now.  And he's -- from my understanding, he has

13    told Doug that until he abandons his crusades and takes care

14    of the family, takes care of me, makes sure -- spends his

15    energies making sure that I'm happy and taken care of and that

16    he takes care of his church responsibilities as well as his

17    obligations and debts, that he needs to see those things in

18    place before he wants to establish contact.

19         Q.   BY MR. WALL:  So your son expects to see actions,

20    not just words?

21         A.   Yes.

22         Q.   Is that fair to say that you expect the same?

23         A.   Yes.

24         Q.   Now, we talked about him working, but you also

25    mentioned about you being happy.  The things that Doug needs

1    to do at home that he has not been doing that will demonstrate

2    that he has actually changed entirely the direction of his

3    life.

4         A.   Yes.   There's contributions to work around the

5    house, work around the yard, keeping things up, going through

6    and cleaning out the old, and as well as, you know,

7    participating in church activities, church functions, personal

8    study, study with me, in those veins, and that it be

9    consistent, that it be ongoing, that it's not just, you know,

10   a two-week span or a two-month span, that it be something that

11   he wants to pursue the rest of his life, and that it's

12   important enough for him to reestablish those type of contacts

13   and relationships.

14        Q.   Now, we spoke briefly on the phone about some of

15   your expectations, but we didn't speak in any detail about

16   what needed to be done if he were to be released in the home.

17        A.   Right.

18        Q.   Would it be fair to say that he doesn't take care

19   of the yard?  He actually needs to go out and push a lawn

20   mower, so to speak?

21        A.   Yes.   Those types of things have always -- sadly

22   but jokingly, I always stated that he outlasts me, that he'll

23   put it off and put it off until I get it done.   But those are

24   things that need to be done.   And that he needs to see it,

25   that he needs to do it, that he needs to act on it and take

1    care of it before I am forced to get to it and take care of it

2    myself.

3         Q.    Would it be better if he acted on it even before

4    you had to think about?  Is that fair to say?

5         A.    Yes; before I even had to notice.

6         Q.    Now, with the discussions that you had with him

7    recently, are you saying that he's now changed to the point

8    where he will engage in those efforts to see that you are made

9    a home as well as having food on the table?

10        A.    I believe that that's possible, that he's -- he's

11   developed the understanding that those are things that are

12   absolute necessity to take care of.

13             MR. WALL:  I have no further questions.

14             THE COURT:  Cross-examination?

15                        CROSS-EXAMINATION

16   BY MR. HUBER:

17        Q.    Ms. Goff, you referenced what you call crusades

18   that your husband has engaged in?

19        A.    Yes.

20        Q.    Those crusades, is it fair to say those are the

21   redemption theories or sovereign activities that he's been

22   involved in?

23        A.    Yes.

24        Q.    Okay.  Over the course of the last couple years and

25   the year that this case has been around, have you seen his

1    commitment to those theories or crusades waiver or ebb and

2    flow?

3        A.   I've seen them -- especially the last few months,

4    I've seen that his expressions have taken a dramatic decrease

5    in those areas, that they've -- I don't know that he doesn't

6    believe them anymore, but I feel like he's willing to put

7    those aside and take care of things that are most important

8    and not pursue those anymore.

9        Q.   As I recall later last year when Judge Campbell was

10   reviewing your husband's detention, that you weren't present

11   at those proceedings when your husband showed a similar

12   apologetic or humble demeanor before Judge Campbell.  You

13   weren't around for those events; is that fair?

14       A.   Correct.

15       Q.   When he was released, when Judge Campbell took him

16   for his word and released him, did he live with you and have

17   interaction with you during that time period before he was put

18   back in custody?

19       A.   Yes, he did.

20       Q.   And during that time period, did you see that

21   apologetic attitude that he had upon release then change to

22   the point where he had words again with the Court in January

23   and was detained again?

24       A.   Yes.

25       Q.   Was that because he was associating with some of

1    his friends who pursued those same crusades?

2         A.   I believe so.  I don't know.  I don't have personal

3    knowledge of --

4         Q.   About how long of time passed away between him

5    being released by Judge Campbell and you seeing the change of

6    his demeanor to one where he's pursuing these redemption

7    theories or sovereign citizen activities?

8         A.   I don't know that I can put a time frame on it.

9    Maybe weeks.

10        Q.   Couple weeks?  Few weeks?  Couple weeks?  Somewhere

11   in there?

12        A.   That's a guess.

13        Q.   Okay.  Thank you.

14             THE COURT:  Anything further?

15             MR. WALL:  Yes.

16                       REDIRECT EXAMINATION

17   BY MR. WALL:

18        Q.   Why didn't you attend the hearing with

19   Judge Campbell?

20        A.   I was uncertain at the time of his direction that

21   he wanted to go, and I did not want it to appear that I was

22   giving the stamp of approval for his release at that time.

23        Q.   Now, I gather that what has occurred with regard to

24   his past conduct has made you seriously consider divorcing

25   him?

1      A.    Yes.

2      Q.    And the changes that you've seen over these last

3   four months, has that disposition about divorcing him changed?

4      A.    It has given me reason to think that there is some

5   hope for our future.

6      Q.    Is it an accurate statement that you're absolutely

7   intolerant of him going back to the behavior that he had

8   before?  And not only will you report it to the Court, but

9   you're also going to divorce him because you don't want to

10  live this way anymore?

11     A.    I will not live this way anymore.  I won't.  I

12  won't live supporting him.  It's not in my budget to support

13  any sort of behaviors.  He is going to have to provide for

14  himself, in essence, and he is going to have to abide by the

15  rules of my home if he wants to live there.

16     Q.    And based on the changes that you've seen over the

17  last four months, today do you believe that he is going to be

18  able to do that?

19     A.    I believe that he can.

20          MR. WALL:  No further questions of this witness,

21  Your Honor.

22          THE COURT:  Does that incur any other questions

23  from the government at this point?

24          MR. HUBER:  No, sir.

25          THE COURT:  Okay.  You may step down.  Thank you.

```
 1                    MR. WALL:  Your Honor, we call Chris Soelberg.

 2                    THE COURT:  Come on up.  Raise your right hand.

 3                         CHRIS VERLE SOELBERG,

 4         called as a witness at the request of Defendant,

 5              having been first duly sworn, was examined

 6                    and testified as follows:

 7                    THE WITNESS:  Yes.

 8                    THE COURT:  Again, remember my admonition for the

 9    prior witness.  Hold that microphone towards you, and speak

10    into the microphone.  The chair doesn't move.  A lot of

11    people --

12                    THE WITNESS:  We can upgrade that, you know.  I'm

13    in construction.  So....

14                    THE COURT:  Give us your name for the record,

15    please.

16                    THE WITNESS:  Chris Verle Soelberg.

17                    THE COURT:  And how do you spell your last name?

18                    THE DEFENDANT:  S, as in Sam, O-E-L-B-E-R-G.

19                    THE COURT:  Thank you.

20                    Proceed.

21                         DIRECT EXAMINATION

22    BY MR. WALL:

23         Q.   Mr. Soelberg, do you know Harvey Douglas Goff?

24         A.   I do.

25         Q.   How do you know him?
```

13

1          A.    He's a neighbor, a friend.

2          Q.    What do you do for a living?

3          A.    I teach construction management at Weber State

4     University.

5          Q.    Since --

6          A.    So we can probably get some upgrade -- you'll have

7     to pay for them, but they make chairs that move.

8                THE COURT:  I understand.  This used to be office

9     space, and it had to be converted to accommodate a --

10               THE WITNESS:  No problem.

11               THE COURT:  -- hearing room.

12         Q.    BY MR. WALL:  We have a little correction going on

13    here to the west of the building.

14               So you -- knowing Mr. Goff, were you his home

15    teacher?

16         A.    I am.

17         Q.    How long have you been his home teacher?

18         A.    I think about five years.

19         Q.    And overall how long have you known him?

20         A.    14 years.

21         Q.    How well do you know him, Mr. Goff?

22         A.    Gosh, I see him a couple times a week, probably.

23         Q.    Okay.  And during that time, have you been able to

24    form an opinion with regard to his conduct and character as to

25    danger in the community, being violent?

1        A.    Yeah.   He's not a dangerous or a violent person.

2        Q.    And with regard to his reliability in following

3   through with something that he said he will do, have you been

4   able to form an opinion with regard to that?

5        A.    Yeah.   I mean, I'd say my association with him

6   through church callings and other community things, yeah, he's

7   always followed through in my opinion.

8        Q.    Would it be fair to that you would be comfortable

9   if he were to be released?

10       A.    Oh, yeah.   In fact, I planned to mow the lawn

11   today.   If you release him today, he can mow the lawn.

12            THE COURT:   Cross-examination?

13            MR. HUBER:   No.   Thank you.

14            THE COURT:   Okay.   Mr. Soelberg, you can step down.

15            THE WITNESS:   Thank you.

16            MR. WALL:   We have no further witnesses.

17            Excuse me.   Mr. Goff.   Mr. Goff will testify, Your

18   Honor.

19            THE COURT:   Okay.

20            Raise your right hand.

21                    HARVEY DOUGLAS GOFF,

22        called as a witness at the request of Defendant,

23            having been first duly sworn, was examined

24                    and testified as follows:

25            THE WITNESS:   Judge, I'll tell you the truth as far

1    as I know it.  I don't know what the whole truth is.

2              THE COURT:  Mr. Goff, don't start equivocating,

3    okay?  If you want to get into a philosophical discussion on

4    what terms mean, this is a simple thing that I've asked you to

5    do, all right?  If you're not willing to do that, that does

6    not incur very good things in front of me.  Do you understand

7    that?  Now, if you're not willing to tell the truth, sit down.

8    I don't want to hear from you.

9              THE WITNESS:  Ask me again, please.

10             THE COURT:  No.  You take an oath to tell the

11   truth.  Are you willing to do that?

12             THE WITNESS:  Yes.  I'm perfectly willing.

13             THE COURT:  Don't equivocate by saying you're

14   qualifying it by saying, as far as you know it.  It is either

15   true or it isn't.  It's that simple.

16             THE WITNESS:  On that we can agree.

17             THE COURT:  So are you willing to do that?

18             THE WITNESS:  Yes.

19             THE COURT:  All right.  Then take the stand.

20             Proceed.

21                      DIRECT EXAMINATION

22   BY MR. WALL:

23        Q.   Mr. Goff, since you've been in custody, have you

24   had time to reflect upon what you've been doing with your

25   life?

1          A.    That's about all I've had time to do.

2          Q.    Have you changed?

3          A.    Most honestly I can tell you I have the desire, I

4    have the desire to change.  I have the desire to exhibit that

5    my first priority is my family.

6          Q.    Have you changed the priorities in your life?  And

7    by that, you know priority means what you put first.  Have you

8    changed?

9          A.    I thought that I was putting my family first by

10   engaging in activities that supported greater freedoms, but I

11   find -- I look where I am, and the result doesn't yield what

12   I'm after.  So I need to change what I do.  For all too long

13   my focus was on doing great and laudable things, and I guess

14   in that, because these things in my mind were great things to

15   do like men like Patrick Henry and Thomas Jefferson and Tom

16   Paine and John Jay and others.  They took on the greatest

17   power in the world in rebelling against the British Crown.

18   And in their day that's what needed to be done, I believe.

19         Q.    And now today, what is it that you need to do if

20   the Judge releases you?

21         A.    I need to go home.  I need to work.  I need to get

22   a job.  I need to sit with my wife in the evenings and visit

23   my parents.  I need to plant my pepper garden.  I need to get

24   a driver's license.  I need to start mending the fences I've

25   broken.  I need to eat a lot of crow.

1    Q.   Now, when you were previously in court you engaged

2    in a colloquy with the Judge based on some information that

3    you had received about how you were supposed to behave in

4    court; is that correct?

5    A.   I take it you're talking about the redemption

6    manual and the things expressed therein?

7    Q.   Yes.

8    A.   Yes.

9    Q.   I show you what has been marked as Defendant's

10   Exhibit Number 1, some excerpts from that manual, Page 66, 67,

11   68.  Do you recognize that?

12   A.   Yes.

13   Q.   What is that?

14   A.   It's a publication that was available over the

15   Internet.

16   Q.   I take it at the last hearing Mr. Utzinger had

17   moved to withdraw from the case?

18   A.   That's correct.

19   Q.   And that was back in November of 2011; is that

20   correct?

21   A.   Yeah.  That's about the same time, the time that I

22   got first notice of his withdrawal.

23   Q.   And the last time that you were in court was for

24   the initial appointment for me to be your counsel; is that

25   right?

1       A.   Well, other than last Monday that would be correct.

2       Q.   And at that time -- at one point you told the --

3            Your Honor, I move for Exhibit 1 to be put into

4   evidence.

5            THE COURT:   Any objection?

6            Okay.   It's received for purposes of this

7   proceeding.

8        (Whereupon, Defendant's Exhibit 1 was received.)

9       Q.   BY MR. WALL:   And at one point in the hearing, the

10  initial appointment of counsel hearing back in January, you

11  said, there being no further business for me I'm leaving, or

12  words to that effect; is that right?

13      A.   That's my recollection, yeah.

14      Q.   Is that based on what is on Page 67?

15      A.   Yes.   It states there, there being no further

16  public business for me I'm leaving.

17      Q.   And you made that statement because that was what

18  was in this redemption manual?

19      A.   Yes.   I was following -- I was following this.

20  This as well as other information that I had.

21      Q.   Now, you now recognize that this proceeding doesn't

22  reflect anything about the real world and what happens in

23  court, don't you?

24      A.   Well, it was the second to the last piece of

25  business we took care of that day.   The next piece of business

1    being my detention.

2         Q.   Will you ever engage in this kind of conduct that

3    is reflected in this redemption manual during the time this

4    case was proceeding in any court proceeding whatsoever again?

5         A.   I'm sorry.  I need to have you repeat the question.

6         Q.   Will you ever engage in the kind of conduct as

7    suggested in this redemption manual in any court proceeding,

8    in any matter, either before this Court or elsewhere ever

9    again?

10        A.   No.

11             MR. WALL:  No further questions.

12             THE COURT:  Cross-examination?

13                       CROSS-EXAMINATION

14   BY MR. HUBER:

15        Q.   Mr. Goff, during your different times in jail, you

16   have had at least limited opportunity to make contact with

17   others on the outside; is that right?

18        A.   I'm able to write postcards.  And most the time

19   that I've been in jail I've been indigent, so I've not been

20   able to make phone calls.

21        Q.   You try to make contact with people like your

22   family.  That's probably true?

23        A.   At the time that I was able to make phone calls, it

24   was almost exclusively with them.  There were a couple of

25   contacts with a couple of people outside of my family, if I

1    recall correctly.

2        Q.   Those people outside of your family would include

3    associates or friends who abide by these redemption theories

4    or sovereign citizen philosophies; is that right?

5        A.   Well, by what I think you mean by the sovereign

6    citizen redemption philosophies, I think my perception is

7    that -- let's see.  Yes.  My perception is that both would

8    adhere to -- you know, information about administrative

9    processes.  In fact, both the people that I recall contacting

10   outside of -- excuse me.  I think I've really botched it here.

11            As I recall, I spoke with members of my family.  I

12   spoke with a woman by the name of Dixie Sampson, and I spoke

13   with a fellow named Garrett Timmerman.

14       Q.   Garrett Timmerman is a promoter of these

15   philosophies; is that a fair statement?

16       A.   I don't think promoter is fair, but he is aware

17   of -- and, in fact, I've consulted with him, you know, sought

18   his advice.

19       Q.   Is he like a mentor to you?

20       A.   It might be fair to call -- it may be fair to

21   characterize him that at one time.

22       Q.   You have not closed off your relationship with

23   Garrett Timmerman; true?

24       A.   I believe that he has closed it off from me.

25       Q.   Another man that you know of may be a friend or an

1     associate, Gordon Miller, is that a name you recognize?

2          A.   Yes.

3          Q.   He's the man who was with you in January sitting in

4     the back of this courtroom prior to your detention; is that

5     right?

6          A.   He was attending that day.

7          Q.   Was he there to support you and prompt you?

8          A.   No, sir.  He was there to carry my bag, to carry my

9     bag out in the event that I got locked up that day.

10         Q.   He is a convicted federal felon; is that right?

11         A.   I believe so.

12         Q.   That day that you were in court, you didn't have

13    this particular piece of paper with you when you were standing

14    on the other side of the bar talking to the Judge; is that

15    right?

16         A.   No.  I had a card that I had prepared based on

17    that, basically a script.

18         Q.   A preprinted script.  You're saying that was a

19    creation of you, not a product that someone else had given to

20    you?

21         A.   That I had put together from information that I'd

22    received from this redemption manual and other sources.

23         Q.   That day in order to get into the courtroom with

24    some certain articles at the security checkpoint, you

25    represented yourself as an attorney; is that right?

1     A.   I was asked -- I was asked by the, I believe you

2   call them court security officers, whether -- I came in.  I

3   showed them that I had -- that I had a cell phone.  I put the

4   bag that I was carrying onto the conveyor for the x-ray

5   machine.  I was asked by one of the court security officers if

6   I was an attorney, and I told him yes.  I'm not a member of

7   the bar.

8     Q.   You said such statement so that you could get in

9   your iPhone and you could get in the digital recording device?

10    A.   No.  I said that I said such statements because

11  according to my understanding of the word attorney that I am

12  an attorney.

13    Q.   So that's again where you equivocate and try to

14  slice through the hairs of words?

15    A.   Well, Mr. Huber, at least as long as I've been

16  around I've understood words to mean things and certain words

17  to mean certain things.  And when one uses the word attorney,

18  I believe that I fit that bill.  I hold myself to be an

19  attorney characterized as an attorney in fact rather than an

20  attorney characterized as an attorney of law.

21    Q.   Are you saying that day in January when you

22  smuggled in your iPhone and recording device to record the

23  proceeding passing by the signs of warning outside the

24  security checkpoint that you were just going by the

25  definitions as they meant to you in order to justify you

1    bringing those items in?

2              MR. WALL:  Objection, Your Honor.

3              THE COURT:  What's the objection?

4              MR. WALL:  It's argumentative; mischaracterizes.

5              THE COURT:  I don't think it's argumentative at

6    all.  The objection is overruled.

7              Answer the question.

8              THE WITNESS:  Thank you, Your Honor.  I'd like to.

9              When I read Black's Law Dictionary, under the term

10   attorney the first definition it has in Black's, the

11   definition in Black's Fourth, as I recall, it's been some

12   months since I've been able to review it, says in the most

13   general sense, one authorized to act in behalf of another.  In

14   Black's Eighth, which I was able to review within the last

15   week, it says, strict -- it says, strictly one authorized to

16   act for another.  And then it says -- it says, also,

17   private -- private attorney or attorney in fact.  And then the

18   second definition addresses an attorney at law in both cases.

19             And so not because I understand it to be that way,

20   but because the legal community understands it to be that way.

21   At least that's my perception when I read Black's Law.

22        Q.   BY MR. HUBER:  In your mind you felt justified to

23   record the proceedings independently?

24        A.   Having not known -- having been unaware that there

25   is a rule of some sort against that, I don't know of any rule

1    in the rules of Federal Rules of Criminal Procedure against

2    it, but I understand that there are some local rules of the

3    court that I'm not aware of.

4        Q.   You certainly objected strongly when the marshals

5    found that and retrieved it from your property.  You were

6    nervous that they had found it.

7        A.   Well, I wasn't particularly nervous, I don't

8    believe.

9        Q.   Did you also feel justified in your mind when you

10   tried to photograph US probation officer Blanca Tillman in her

11   office during a visit?

12       A.   Ask again, please?

13       Q.   Ms. Blanca Tillman, US probation officer, you know

14   her?

15       A.   Yes.  Uh-huh (affirmative).

16       Q.   Do you recall the time that you tried to take her

17   photograph in her office or in the US probation office during

18   a visit?

19       A.   I recall asking her for permission.  As I raised

20   my -- as I raised my phone, she objected, and I didn't take

21   the picture.

22       Q.   Did you also feel justified in your own mind

23   according to your understanding of words and instructions when

24   you went around Mr. Utzinger and contacted Judge Campbell's

25   chambers directly?

1          A.    What's your question?

2          Q.    Did you feel justified when you did that?

3          A.    At the time, yes.  I had questions to ask of

4     Judge Campbell's clerk.  I don't recall exactly what the

5     questions were at the time, but I do recall having done so and

6     that I wasn't able to contact Mr. Utzinger.  I also understand

7     or I'd been given -- I'd been given to understand that it

8     caused a bit of a brouhaha.

9               MR. HUBER:  No more questions, Judge.

10              THE COURT:  Redirect?

11                         REDIRECT EXAMINATION

12    BY MR. WALL:

13         Q.    Mr. Huber has been asking you some questions about

14    things that occurred prior to January as well as the detention

15    hearing in January.  I want to touch base on some of those

16    things.

17              With regard to your statement that you were an

18    attorney, you're basing that on your review of Black's Law

19    Dictionary?

20         A.    Not just my review of Black's Law Dictionary, but

21    the fact that I've accepted responsibility as an authorized

22    representative, not only -- not only one, but several people.

23    In fact, Mr. Miller who Mr. Huber asked me about was one of

24    those -- was one of those persons, and another -- and others

25    who I've, you know, had a business relationship with.

1    Q.   But you didn't ask Mr. Utzinger about what an

2    attorney meant because he wasn't representing you at that

3    time; is that right?

4    A.   At which time?

5    Q.   At the time that you were coming into the

6    courthouse or thinking about going in the courthouse and

7    saying you were an attorney.

8    A.   I've been asked numerous times before when visiting

9    this building, and --

10   Q.   You didn't ask Mr. Utzinger, did you?

11   A.   I've never had a conversation with Mr. Utzinger

12   about what an attorney is, to my recollection.

13   Q.   Okay.  And you didn't have a discussion with a

14   lawyer about whether it was appropriate for you to say that

15   you were an attorney coming into the courthouse, did you?

16   A.   No.  I don't think I've ever had a discussion with

17   anyone about that until you presented the issue with me a

18   couple weeks ago.

19   Q.   Now that I'm representing you, is that something

20   that you would bring to my attention before you endeavored to

21   come into a courthouse?

22   A.   That is something that -- oh, boy.  I would hold --

23   I would be very, very, very, very careful here in the future

24   about that.  In fact, I don't think I'll adopt the word

25   attorney anymore.  I think I'd say agent or authorized

1    representative.

2         Q.   Okay.  My question is --

3         A.   And if I ever said attorney, I'd say attorney in

4    fact, and that is someone who has power of attorney.

5         Q.   The question was, if you were to ever endeavor to

6    come into the courthouse and plan to make any kind of a

7    comment, would you discuss that with me first or would you

8    just go off and do it?

9         A.   Well --

10        Q.   Yes or no?  You would or you wouldn't?

11        A.   For making that type of a comment, no, I don't

12   think I'd be making that kind of a comment.  And if I ever did

13   again, I'd think twice about it before -- you know, before

14   doing so.  And if I still wanted to do so, I think I would

15   seek counsel from someone such as yourself.

16        Q.   Would you follow my advice if I told you not to say

17   anything other than, I'm here and you need to search me?

18        A.   I believe I would now.

19        Q.   With regard to the recording, you didn't talk to an

20   attorney about bringing your recorder in the courthouse, did

21   you?

22        A.   No, I had not.

23        Q.   And you understand now that there are rules and

24   regulations prohibiting that; correct?

25        A.   That's -- I think I understood that as soon as the

1   marshal started making a big issue about it when he found the

2   device running and operating in my pocket.

3              MR. WALL:  Your Honor, I think the Court can take

4   judicial notice that it is prohibited by the Marshal Service

5   to bring any kind of recording device in the courthouse.

6              THE COURT:  I'm aware of it.

7        Q.   BY MR. WALL:  With regard to contacting chambers

8   from this point forward, would you contact me personally

9   before you ever endeavored to contact chambers or a judge?

10       A.   I would -- in this case I would go to you.  I don't

11  know what your fees are in other matters, but I would go to --

12  I would go to counsel.

13       Q.   With regard to every aspect of everything that you

14  do in this case from this point forward, will you follow my

15  advice?

16       A.   Yeah.

17       Q.   Now, Mr. Huber asked you some questions about some

18  folks that you'd been in contact with, Gordon Miller, Garrett

19  Timmerman and Dixie Sampson?

20       A.   Yes.

21       Q.   Are you willing to have absolutely no contact with

22  them whatsoever if the Judge releases you?

23       A.   Probably the most difficult would be Dixie Sampson.

24  Two days before I was again detained, I --

25       Q.   My question was, would you be willing to have

1    absolutely no contact with them if the Judge released you?

2        A.   If that's a condition of his order, then I would

3    abide by it.

4        Q.   And would you be willing to have absolutely no

5    contact with anyone associated with them having anything to do

6    with concerns relating to administrative procedures or

7    Constitution or political activities?

8        A.   I think my -- I think my political activist days

9    are done.

10       Q.   So you would have absolutely no contact with any of

11    their associates; is that fair to say?

12       A.   There are good people among them, and I'll regret

13    not having that contact.  But I would -- you know, just like

14    other folks that I've known and had good relationships in the

15    past, we come together and then we -- and then the time comes

16    for a relationship to be over.  I think at this time it's time

17    for me to be focusing on other things, be focusing closer to

18    home.

19             MR. WALL:  Nothing further.

20             THE COURT:  Anything further, Mr. Huber?

21             MR. HUBER:  No, sir.

22             THE COURT:  You may step down.

23             Anything further?

24             MR. WALL:  Nothing from the defense, Your Honor.

25             THE COURT:  Okay.  From the government?

1          MR. HUBER:  I call Special Agent Casey Hill.

2          THE COURT:  Go ahead and sit down.

3          Come on up.  Raise your right hand.

4                         CASEY HILL,

5       called as a witness at the request of Plaintiff,

6            having been first duly sworn, was examined

7                    and testified as follows:

8          THE WITNESS:  Yes.

9          THE COURT:  Hold that mike over towards you and

10   speak into the microphone.  And give us your name for the

11   record and spell your last name.

12         THE WITNESS:  Casey Hill, H-I-L-L.

13         THE COURT:  Thank you.

14                    DIRECT EXAMINATION

15   BY MR. HUBER:

16      Q.   Special Agent Hill, you work with the Internal

17   Revenue Service; is that right?

18      A.   Yes, that's correct.

19      Q.   You've been a co-case agent from the beginning of

20   the investigation now prosecution of Mr. Goff; is that right?

21      A.   That's correct.

22      Q.   You've had occasion during the couple years that

23   you've been involved to observe Mr. Goff's willingness to

24   follow court orders and the law generally?

25      A.   From what I've observed.

1    Q.   Have you seen a pattern in Mr. Goff's approach to

2  the federal court, this court, during the pendency of this

3  prosecution?

4    A.   I was present during the hearing where

5  Judge Campbell did release Mr. Goff, and he appeared very

6  apologetic and wanted to get out and see the birth of his

7  grandson or grandchild, I should say, I don't know the gender,

8  and wanted to get back to his family.

9    Q.   Do you see a comparison between that behavior in

10  front of Judge Campbell and the behavior that you saw Monday

11  in front of Judge Alba?

12    A.   He appeared very apologetic on Monday, as well.

13    Q.   Were you involved or were you in attendance in a

14  January hearing where he was put in custody this last time?

15    A.   Yes, I was.

16    Q.   Did you observe his companion that day in court?

17    A.   Yes, I did.

18    Q.   Why did you take note of him?

19    A.   I went up -- I wanted to know who he was.  I went

20  and asked him his name.  He said his name was Stanley.

21  Wouldn't give me a name at all.  I further found out and

22  recognized that he was Gordon Miller, Gordon Stanley Miller.

23    Q.   When you talked to him was it after Mr. Goff had

24  been removed from the courtroom?

25    A.   Yes, it was.

1    Q.   And what was your intent in trying to talk to

2    Mr. Miller, we know now as Mr. Miller?

3    A.   Well, I wanted to know the type of individual he

4    was, if he was taking notes, if he's providing any information

5    to Mr. Goff, what type of support he was providing.

6    Q.   Did you observe anything in the conduct between the

7    two of them that suggested what was going on?

8    A.   They had spoken, and Mr. Miller did have, like it

9    was either a notebook or manilla folder or some sort of

10   paperwork on him.

11   Q.   Okay.  So when you did do the research and

12   investigation to find out who Stanley was, can you tell us

13   about his background a little bit as it relates to the federal

14   courts?

15   A.   Gordon Miller was convicted of wire fraud.  Before

16   he -- I can't tell you when, at some point in time before he

17   was incarcerated he skipped the country.

18   Q.   Do you recall or have you received reports and

19   confirmed that Mr. Goff in turn was there to support

20   Mr. Miller during his proceedings?

21   A.   Yes.  I had heard that during a trial of Mr. Miller

22   that an individual in the back of the courtroom had stood up

23   and had spouted some sort of, you know, rhetoric that wasn't

24   appropriate for the courtroom and that person had been removed

25   by the marshals, and we came to find out that was Mr. Goff.

1      Q.    You confirmed that with the Marshal Service?

2      A.    Yes, we did.

3      Q.    Are you familiar with the state prosecution of

4  Mr. Goff that proceeded, led up to at least the lien filing

5  half of the case now before the Court?

6      A.    Yes, I am.

7      Q.    And that was up in Weber County, Utah?

8      A.    That's correct.

9      Q.    Are you aware of the period of time that Mr. Goff

10  was a fugitive in that case?

11     A.    That's correct.

12     Q.    Can you tell us a little bit about what you learned

13  about that?

14     A.    I learned he didn't show up for some sort of

15  hearing.  He didn't go home.  The Ogden City Police had

16  surveillance on his home waiting to arrest him because he

17  hadn't shown up to his hearing.  And at some point in time, an

18  off-duty officer in Brigham City eating at a restaurant

19  recognized him.  And at that point they made the arrest and

20  took him into custody.

21     Q.    This Dixie Sampson who has been referenced today,

22  you know of her; is that right?

23     A.    That's correct.

24     Q.    Can you tell us a little bit of background about

25  what you know about her?

34

1      A.    She notarizes a lot of documents that appear to be

2  in the sovereign citizen movement.

3      Q.    Did Mr. Goff purportedly have a job with her at

4  some point?

5      A.    Yeah.  I believe Blackstone or Black something

6  Legal.  He had listed his employment with Blanca Tillman, and

7  Dixie -- I don't know if Dixie Sampson runs the company.  I

8  know she works there and is highly integrated in that company.

9      Q.    And from the evidence that you've seen, she is

10  engaged in these redemption theories, sovereigns and

11  activities?

12      A.    Yes.

13          MR. HUBER:  Thank you.

14          THE COURT:  Cross-examination?

15          MR. WALL:  Thank you, Your Honor.

16                    CROSS-EXAMINATION

17  BY MR. WALL:

18      Q.    Mr. Goff has made all of the federal court hearings

19  that he's been assigned to appear at, as far as you know;

20  correct?

21      A.    As far as I know, yes.

22      Q.    At the time Mr. Goff was taken into custody in

23  January, he was very vocal; correct?

24      A.    Yes.

25      Q.    But he didn't engage in any kind of physical

1    violence towards any of the detention officers, did he?

2         A.   No.

3         Q.   In fact, he left peacefully down in the holding

4    cell?

5         A.   I didn't walk him to the holding cell, but from

6    what I saw to that point, yes.

7         Q.   And you haven't received any reports indicating

8    that he engaged in any kind of violent conduct, have you?

9         A.   I have not.

10        Q.   And as case agent you would expect that you would

11   see such reports if they existed?

12        A.   Yes, I would expect that.

13        Q.   Now, at the time that Mr. Goff was released at the

14   hearing with Judge Campbell, his wife Lisa Goff didn't

15   testify, did she?

16        A.   No, she did not.

17        Q.   You didn't ask her why she didn't come to court,

18   did you?

19        A.   No, I did not.

20        Q.   But it was duly noted that she apparently was not

21   there.

22        A.   Yes.  I did notice that.

23        Q.   Didn't even show up to support him.

24        A.   No.

25        Q.   But she's here today.

1          A.    Yes.

2          Q.    And she's made it clear -- you were in the

3     courtroom when she testified?

4          A.    Yes, I was.

5          Q.    She made it clear that she has expectations?

6          A.    Yes.

7          Q.    That he have a real job?

8          A.    I heard that.

9          Q.    And that he take care of her?

10         A.    Yes.

11         Q.    And that he work around the house?

12         A.    Yeah.

13         Q.    And she's indicated that she has seen a change in

14    him since January; correct?

15         A.    Yes.

16         Q.    You haven't had any contact with Mr. Goff since

17    January, have you?

18         A.    No, I have not.

19         Q.    So if there has been a change, it's not something

20    that you would be at all aware of.

21         A.    I'm not aware of any change.

22              MR. WALL:  No further questions, Your Honor.

23              THE COURT:  Okay.  You may step down.

24              Anything further?

25              MR. HUBER:  No, sir.

1          THE COURT:  Argument?

2          MR. HUBER:  Judge, United States' position is that

3    there has not been a change in circumstances that you can

4    guarantee Mr. Goff is going to follow the orders of this

5    Court.  We are not concerned with danger in the traditional

6    sense, we're concerned about a flight risk and his ability to

7    abide by this Court's orders.  We've seen today through his

8    own speaking patterns, the way he responds to questions, even

9    the Court's questions that he is equivocal, he still ascribes

10   to these odd beliefs and philosophies as attorney in fact

11   thing that he references, you know.  He will not let go of

12   those philosophies that continue to get him in trouble with

13   the law.

14          He maintains contact with these mentors and

15   like-minded people from jail.  His wife told us that though he

16   appeared to be a changed man in front of Judge Campbell when

17   he was released, within a matter of weeks he's back into it.

18          And we believe that's what's going to happen here

19   again, Judge.  We need this case to proceed to trial and be

20   resolved that way.  And he needs to stay in custody during

21   that time so that he will guarantee he will abide by the

22   Court's instructions and orders.

23          THE COURT:  Thank you.

24          Counsel?

25          MR. WALL:  Your Honor, I think the evidence in this

1    case is that there is a change, a significant change in

2    Mr. Goff.

3            THE COURT:  How is it any different than the last

4    time that it was presented before Judge Campbell?  Now, that's

5    a rhetorical question.  I had made the decision before that he

6    was to be detained, and, in fact, he was.  An appeal was made

7    to Judge Campbell.  Representations were made there.  I was

8    not present, but she released him.  And all I know is that

9    subsequent conduct that occurred.  He was back into the same

10   type of activity that got him in trouble in the first place,

11   which is the reason why I kept him in custody.

12           MR. WALL:  And I would submit to you that at the

13   time that you took him into custody in January he hadn't

14   changed.  But what I think has occurred, what has been shown

15   to have occurred and what is significant is that Mrs. Goff

16   didn't testify previously either before you or before

17   Judge Campbell.  Her absence should have been duly noted

18   because the significance is she didn't see that he had any

19   difference of opinion or disposition or behavior or conduct,

20   and she was unwilling to even comfort or even appear to

21   support him.

22           THE COURT:  Mr. Wall, here is my concern, all

23   right?  And it starts with the oath that I administered and

24   the equivocating that he engaged in in trying to pars out what

25   that meant.  It's a rather simple issue what an oath is before

1     the Court.  That bothers me, and it bothers me immensely.

2              MR. WALL:  As well it should, Your Honor.  But I

3     think there is another difference, and that is I'm going to be

4     able to work with him.  He's going to have to change not only

5     his thinking patterns, but his speech pattern and the way in

6     which he responds.  And that's not something --

7              THE COURT:  Even in response to some of your own

8     questions he was equivocating.

9              MR. WALL:  But, Your Honor, I think --

10             THE COURT:  Trying to pars out language, okay?

11    Part of what goes on in this particular activity of this

12    group.  To me, that's evidence that the change hasn't

13    occurred.

14             MR. WALL:  Your Honor, I think the change is

15    occurring, and I think there's a sufficient change that has

16    occurred that the Court should consider his release.  And the

17    reason is, yes, it's very difficult for him to say, I'm going

18    to follow what my attorney says through and through.  But he

19    says it now, and he didn't before.  It's very difficult for

20    him to say, this thing that has been a big part of my life,

21    I'm going to set aside.  But he has not only said it to his

22    wife, he's committed to it, which is something he had not done

23    before.  He has frankly laid waste to his family and the life

24    that he has had and the single child that he has had for

25    years.  He is now committed to that change, because frankly,

1    previously he hasn't really had to sit down and think about

2    it.  He's been in custody for four months.  He has recognized

3    now what a disaster he's made in his life, and he's changed

4    his priorities significantly.  He's no longer trying to act

5    like Paine or any of the founding fathers to change the world

6    dramatically.  He wants to go home, he wants to work, he wants

7    to take care of his family, and he realizes that these grand

8    projects are not significant.

9         And this change in realization is huge for him.

10   What he has realized is he has destroyed his wife and his son

11   and their lives, and he now has one thread of hope to make a

12   difference by simply putting food on the table, taking care of

13   the yard and doing those simple, frankly, practical duties

14   that any person has toward their family.  And he has shifted

15   by making that his priority.  And that for a person of his

16   nature is huge.

17        And that's a basis where this Court should consider

18   putting him on an ankle monitor.  He can be managed by

19   complete restriction with regard to the individuals listed and

20   like-minded people.  But the Court has in its pocket on its

21   side and in its favor a huge ally, and that's Mrs. Goff,

22   because, frankly, Your Honor, she's done with it, and she's

23   testified I think very candidly, she's not going to tolerate

24   any more of it.  It's got to be a legitimate job with bread on

25   the table.  He's got to take care of her and come home.  And,

1    frankly, Your Honor, the moment she says to probation officer,

2    he's not doing what he should, back into custody for the rest

3    of the case, because she is done with it.

4          And I think this Court is done with that kind of

5    behavior.  Certainly modification of the way he responds can

6    occur.  But, frankly, there is a significant change.  It's a

7    huge change.  And that's why today unlike any previous hearing

8    she took the stand and put it forward.  And I think that is

9    what is meant by a substantial change.

10          And I think that there's sufficient change now that

11    the Court can release him and that he is not going to go back

12    to that kind of life.  Otherwise, he is fully aware that he

13    will never have another opportunity for release.

14          THE COURT:  Okay.

15          Response?

16          MR. HUBER:  Judge Campbell gave him the same

17    ultimatum that Mr. Wall said his wife is giving now, and that

18    is, you don't mess up.  If you mess up, you're back in custody

19    for the duration of the case.  And that's what happened in

20    January.  We don't need to go back on Judge Campbell's word.

21          And the instructions that Your Honor gave him at

22    the various hearings, series of hearings that we've had trying

23    to just have a normal conversation and a useful perfunctory

24    hearing with him, we are unable to do that because he won't

25    relinquish these thoughts and ideas that get him in trouble

1    and that victimized the rest of us.  He should stay in.

2              THE COURT:  Okay.  Well, here's what I'm going to

3    do.  I do find that there hasn't been a substantial change

4    under the circumstances that previously were presented to me.

5    And I find that the defendant constitutes a danger to the

6    community because of that because I don't think that he's

7    still willing to listen to what the Court orders on.  That was

8    my problem the first time.  That's why I did not order him

9    released.  Judge Campbell released him with the same

10   admonitions, and within a short period of time he was back at

11   it again, disobeying the Court orders.  I don't have any trust

12   or confidence that he will abide by any orders that I impose.

13   And, therefore, he's so ordered in continued detention.

14             (Whereupon, the court proceedings were concluded.)

15                       *   *   *   *   *

16

17

18

19

20

21

22

23

24

25

1   STATE OF UTAH        )

2                        ) ss.

3   COUNTY OF SALT LAKE  )

4           I, KELLY BROWN HICKEN, do hereby certify that I am

5   a certified court reporter for the State of Utah;

6           That as such reporter, I transcribed the hearing of

7   the foregoing matter on May 16, 2012, from an electronically

8   recorded tape to the best of my ability to hear and understand

9   said electronic tape recording; and the foregoing pages

10  numbered from 3 through 43 constitute a full, true and correct

11  report of the same to the best of my ability to hear and

12  understand said recording.

13          That I am not of kin to any of the parties and have

14  no interest in the outcome of the matter;

15          And hereby set my hand and seal, this ____ day of

16  _____ 2012.

17

18

19

20

21          _____

22                  KELLY BROWN HICKEN, CSR, RPR, RMR

23

24

25